**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X

DANIEL KOTLER and MICHAEL NIRENBERG,

Plaintiffs,

-against-

IATSE LOCAL USA 829,
NBCUNIVERSAL MEDIA, LLC,
UNIVERSAL TELEVISION LLC,
and UNIVERSAL CITY STUDIOS LLC,

Defendants.

---------------------------------------------------------------X

**Case No.: _______________**

**COMPLAINT AND JURY DEMAND**

DANIEL KOTLER and MICHAEL NIRENBERG (collectively, "Plaintiffs"), by their attorneys, THE FARROW FIRM, PLLC and the LAW OFFICES OF DAVID E. OURLICHT, PLLC, for their Complaint against Defendants IATSE LOCAL USA 829 (the "Union"), NBCUNIVERSAL MEDIA, LLC, UNIVERSAL TELEVISION LLC, and UNIVERSAL CITY STUDIOS LLC, allege upon personal knowledge as to themselves and upon information and belief as to all other matters as follows:

## NATURE OF ACTION

**1.** This is a hybrid action under Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), and the Union's duty of fair representation arising from its status as Plaintiffs' exclusive bargaining representative under Section 9(a) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 159(a). Plaintiffs allege that the Employer Defendants breached the governing collective bargaining agreement and that the Union's arbitrary and bad-faith conduct deprived Plaintiffs of access to the binding contractual arbitration process for those breaches.

**2.** The Employer Defendants breached Article I(C)(6) of the CBA by conditioning Michael Nirenberg's appointment as Charge Scenic Artist on his advance agreement to engage a particular Journeyperson Scenic Artist, directing Nirenberg to treat that person's approval and prioritization as predetermined, requiring Daniel Kotler to administer the same predetermined engagement directive during periods when he served and was paid as acting Charge Scenic Artist, and disciplining Plaintiffs for invoking or seeking enforcement of the contractual approval requirement.

**3.** The Employer Defendants separately breached Article 17(C), which prohibits discrimination against employees and applicants because of Union membership or Union activities, by escalating discipline and ultimately refusing to consider Plaintiffs for Season 28 of *Law & Order: SVU* after Plaintiffs invoked the CBA, sought Union representation, demanded grievances, and challenged the Union's handling of their contractual claims. The Employer issued final written warnings while Plaintiffs were on seasonal hiatus, were not actively performing work on the production, and were awaiting consideration for re-engagement, and thereafter relied on their nonparticipation in meetings during that hiatus as a basis to exclude them from Season 28.

**4.** The Union breached its duty of fair representation by refusing to evaluate Daniel Kotler's distinct grievance on its own facts, allowing the contractual arbitration deadline applicable to Nirenberg's grievance to expire before closing it, misrepresenting Nirenberg's authorization while instructing Plaintiffs to follow the Employer "regardless of the CBA," and refusing to pursue Plaintiffs' Article 17(C) grievances concerning Season 28.

**JURISDICTION AND VENUE**

**5.** This Court has subject-matter jurisdiction over Plaintiffs' hybrid Section 301/duty-of-fair-representation claims pursuant to Section 301(a) of the LMRA, 29 U.S.C. § 185(a), and 28 U.S.C. §§ 1331 and 1337.

**6.** Venue is proper in this district because the events giving rise to Plaintiffs' claims occurred in the Southern District of New York, and Defendants transact business within this district.

**PARTIES**

**7.** Plaintiff Daniel Kotler is an individual residing in New York County, New York. During Season 27 of *Law & Order: SVU*, he was employed by NBCUniversal as a bargaining-unit Journeyperson Scenic Artist and Foreman.

**8.** Plaintiff Michael Nirenberg is an individual residing in Kings County, New York. During Season 27 of *Law & Order: SVU*, he was employed by NBCUniversal as a bargaining-unit Charge Scenic Artist.

**9.** Defendant NBCUniversal Media, LLC is a Delaware limited liability company with its principal place of business in New York, New York. NBCUniversal Media, LLC participated in and administered the Human Resources and labor-relations decisions challenged in this action.

**10.** Defendant IATSE Local USA 829 is a labor organization within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5), with its principal office in New York, New York. At all relevant times, Local 829 was the exclusive bargaining

representative for Plaintiffs within the meaning of Section 9(a) of the NLRA, 29 U.S.C. § 159(a).

**11.** Defendant Universal Television LLC is a subsidiary or affiliated entity of NBCUniversal Media, LLC. Upon information and belief, Universal Television LLC participated in or administered employment, payroll, production, or labor-relations functions concerning Plaintiffs and *Law & Order: SVU*.

**12.** Defendant Universal City Studios LLC is a subsidiary or affiliated entity of NBCUniversal Media, LLC and was a Producer bound by the CBA applicable to Plaintiffs' bargaining unit.

**13.** At all relevant times, NBCUniversal Media, LLC, Universal Television LLC, and Universal City Studios LLC shared common ownership, interrelated operations, centralized control over labor relations, and common management concerning the conduct alleged. Human Resources representatives Kate O'Brien, Danielle Terrigino, and Sofia Vazquez participated in the challenged discipline and Season 28 employment decisions, and Plaintiffs' Deal Memos, payroll, or production employment records were administered [1]or processed through one or more of the Employer Defendants. NBCUniversal Media, LLC and Universal Television LLC are liable to the extent the evidence establishes that they assumed or administered the relevant CBA obligations, acted as agents or alter egos of Universal City Studios LLC, or operated with it as a single integrated employer for purposes of the conduct alleged. NBCUniversal Media, LLC, Universal Television LLC,

[1] Terrigino is Danielle's married name. Stefania is her maiden name.

and Universal City Studios LLC are referred to collectively as the "Employer Defendants" or the "Employer."

## Factual Allegations

### A. Background

**14.** Plaintiff Daniel Kotler is an individual residing in the county of New York, State of New York. He has worked for NBCUniversal on various projects for eighteen years. At all relevant times, he was employed by NBCUniversal on Law & Order: SVU, where he began working in 2019. He became part of the core crew in 2020, was promoted to Location Lead in 2023, and became Foreman in 2025.

**15.** Plaintiff Michael Nirenberg is an individual residing in Kings County, New York. He has worked intermittently as a freelance scenic artist on NBCUniversal productions since approximately 2006. He began working on Law & Order: SVU in 2015, initially as a freelance Journeyperson Scenic Artist for approximately two years, then served as Camera Scenic Artist for eight seasons, and became Charge Scenic Artist for Season 27 in July 2025.

### B. Plaintiffs' Background and Bargaining-Unit Status

**16.** Kotler has worked on NBCUniversal productions for eighteen years. He began working on *Law & Order: SVU* in 2019, joined its core scenic crew in 2020, became Location Lead in 2023, and became Foreman in 2025. During Season 27, when Nirenberg was unavailable, Kotler also served temporarily as acting Charge Scenic Artist on multiple days across several weeks. NBCUniversal's payroll records reflect that Kotler was compensated in the Charge Scenic Artist classification for those assignments.

**17.** Nirenberg has worked as a scenic artist on NBCUniversal productions for more than nineteen years. He worked on Law & Order: SVU as a freelance Journeyperson Scenic Artist for approximately two years, served as Camera Scenic Artist for eight seasons, and became Charge Scenic Artist for Season 27 in July 2025.

**18.** Both Plaintiffs were members of Local 829, worked in classifications covered by the CBA, and were treated by the Employer and Union as bargaining-unit employees. As the regularly assigned Charge Scenic Artist, Nirenberg exercised day-to-day craft and staffing coordination over the active freelance scenic crew. Within the constraints of budgeted man-days, production schedules, crew availability, the skills required for particular assignments, the CBA, and Employer directives, he identified, contacted, and approved Journeyperson Scenic Artists for discrete production assignments. When Nirenberg was unavailable, Kotler temporarily served as acting Charge Scenic Artist and performed the same limited production-level craft, staffing, scheduling, and approval functions for the duration of those assignments. The Employer knew of, accepted, and compensated Kotler for his performance of that temporary Charge Scenic Artist role.

**19.** Neither Plaintiff, including Kotler while serving temporarily as acting Charge Scenic Artist, could set compensation or benefits, formally hire an individual into NBCUniversal's workforce, place an individual on payroll, suspend or formally discipline an employee, terminate an individual's broader employment with NBCUniversal, adjust grievances, or formulate Employer policy. The Employer Defendants retained and exercised ultimate authority over payroll, compensation, formal hiring, discipline, discharge, continued employment, and engagement beyond particular production assignments. The Employer also retained authority to review and override Plaintiffs' production-level staffing decisions

and exercised that authority by requiring the engagement of Micaela Carolan ("Carolan"), notwithstanding Plaintiffs' assessments and objections.

### C. The Collective Bargaining Agreement

**20.** Article I(C)(6) provides:

"JOURNEYPERSON SCENIC ARTISTS, if engaged, must meet with the approval of the CHARGE SCENIC ARTIST as necessary to assist in the work outlined in subparagraph C.(5) above."

**21.** Article I(C)(6) establishes a distinct approval function for the Charge Scenic Artist. Plaintiffs do not dispute that the Producer retained authority to determine whether additional staffing was needed and whether to seek the engagement of a Journeyperson Scenic Artist. Once the Producer sought to engage a particular Journeyperson, however, that individual was required to meet with the approval of the Charge Scenic Artist.

**22.** Consistent with that allocation of functions, the Employer Defendants assigned Nirenberg responsibility for day-to-day scenic-crew scheduling, staffing outreach, and the approval function established by Article I(C)(6), subject to the Employer's ultimate employment authority. When Nirenberg was unavailable, the Employer assigned, recognized, and compensated Kotler as acting Charge Scenic Artist, and Kotler temporarily performed the limited production-level staffing, scheduling, and approval functions associated with that classification.

**23.** Plaintiffs' dispute does not concern whether the Employer could determine the size of the crew, whether additional staffing was necessary, or whether to seek the engagement of a

Journeyperson Scenic Artist. It concerns whether the Employer could select Carolan, predetermine that she had been approved, eliminate the separate approval required by Article I(C)(6), and discipline Plaintiffs for refusing to treat that requirement as a formality.

**24.** Article 17(B) governs contractual arbitration. It requires the Union and Producer to attempt promptly and in good faith to resolve disputes involving the interpretation or application of particular provisions of the CBA or alleged violations of those provisions.

**25.** Article 17(B) permits either the Union or the Producer, but not an individual bargaining-unit employee, to submit an unresolved contractual dispute to arbitration.

**D. The Workplace and Staffing Conflict**

**26.** Beginning in September 2024, Carolan, a fellow bargaining-unit member, engaged in a pattern of workplace conduct that generated serious conflict within the scenic department. The conduct included public accusations against crew members, unauthorized recordings, threats, repeated challenges to staffing decisions, and efforts to undermine the professional reputations of Plaintiffs and other crew members.

**27.** In September and October 2024, Carolan publicly accused Kotler and his brother, Joseph Kotler (scenic crew member), of being “sexual predators” because they had spoken with a younger crew member. Witnesses Ajamu Walker and Millree Hughes disputed the accusations.

**28.** Hughes later reported that Carolan acknowledged to crew members that the accusations were “bogus,” expressed a desire to apologize, and attributed her statements to the influence of another scenic artist.

**29.** NBCUniversal investigated the allegations against Kotler. On June 17, 2025, HR Director Sofia Vazquez informed him in writing: "We did not find that your behavior violated Company policy."

**30.** Other documented concerns included Carolan's unauthorized recordings of male crew members, accusations of drug use, degrading comments about male crew members' physiques, repeated insubordination, and a statement that she would "burn the place down" if the production attempted to fire her.

**31.** On April 23, 2025, James St. Clair and Jamie Covington, who were then serving as co-Charge Scenic Artists and alternating responsibility every few weeks, informed Carolan that she would not be returning for the following season because of her workplace conduct and its effect on crew operations. The production did not have a Foreman at that time. Carolan thereafter submitted complaints to Human Resources that Plaintiffs and several witnesses disputed and countered with contrary accounts and documentary evidence.

**32.** On June 3, 2025, St. Clair provided HR with a written account describing Carolan's accusations, recordings, and conduct toward other crew members. In early July 2025, St. Clair and Covington were removed from their positions on the production where they had been for decades.

**E. The Employer Conditions Nirenberg's Appointment on Carolan's Engagement**

**33.** On July 3, 2025, Nirenberg emailed Human Resources Director Sofia Vazquez concerning NBCUniversal's proposed return of Carolan for Season 27. Nirenberg informed Vazquez that Local 829 had advised him not to meet with Human Resources concerning Carolan

without Union representation and requested that a Union representative attend his first meeting with HR. The meeting was scheduled for July 8, 2025.

**34.** Before the July 8 meeting, Production Designer Dan Davis offered Nirenberg the Charge Scenic Artist position for Season 27. As Charge Scenic Artist, Nirenberg would perform the approval function established by Article I(C)(6), under which a Journeyperson Scenic Artist selected for engagement was required to meet with the approval of the Charge Scenic Artist.

**35.** At the July 8 meeting, Vazquez and HR representative Danielle Terrigino informed Nirenberg that his appointment as Charge Scenic Artist was conditioned upon his agreement to engage Carolan. They told him that Carolan's engagement was mandatory and that the condition was not subject to negotiation or to his independent approval under Article I(C)(6).

**36.** Nirenberg objected and explained that he had substantial concerns regarding Carolan's return, including her prior accusations against crew members, workplace conduct, reliability, responsiveness to work communications, and effect on department operations. He attempted to discuss whether those concerns should be evaluated before she was returned to the crew.

**37.** Vazquez and Terrigino rejected Nirenberg's objections and made clear that he would not receive or retain the Charge Scenic Artist position unless he agreed to engage Carolan. The meeting therefore did not permit Nirenberg to exercise the approval function contemplated by Article I(C)(6); NBCUniversal dictated the result as a condition of his appointment.

**38.** On July 9, 2025, one day after the meeting, Nirenberg contacted Carolan to initiate her engagement. He did so because NBCUniversal had conditioned his appointment on compliance with its directive, not because he had independently evaluated and voluntarily approved Carolan pursuant to Article I(C)(6).

**39.** Nirenberg's compliance with the ultimatum did not waive the contractual approval requirement or convert NBCUniversal's predetermined hiring directive into a voluntary exercise of his contractual judgment.

**F. Carolan's Performance, Availability, and Communications**

**40.** On July 22, 2025, members of the scenic crew reported to Nirenberg that Carolan had been ignoring work-related requests and spending extended periods on her telephone instead of performing assigned tasks. During a discussion concerning those concerns, Carolan called Nirenberg "incompetent" in the presence of other crew members, undermining his authority as Charge Scenic Artist and disrupting department operations.

**41.** On July 23, 2025, Carolan took two unauthorized breaks during the workday. The following day, after she was confronted about texting instead of working, Carolan left the set without notifying Nirenberg or obtaining authorization, requiring the department to address her absence while work remained ongoing.

**42.** On August 5, 2025, at approximately 7:00 a.m., Nirenberg contacted Carolan to determine whether she was available to work the following day. Although the request required a timely response so that staffing could be arranged, Carolan did not reply until approximately 5:02 p.m., when she stated that she was sick and unavailable. Her delayed

response left Nirenberg with insufficient time to locate and confirm a replacement, causing the department to operate short-staffed.

**43.** On August 18, 2025, the scenic crew was required to redo work that Carolan had performed incorrectly. That same day, Carolan complained that assignments were being distributed unfairly. When Nirenberg offered her an available assignment, however, she declined it, and Nirenberg reassigned the work to an experienced scenic artist with approximately twenty years in the industry so that the production could proceed without further delay.

**44.** Four days later, on August 22, 2025, Nirenberg informed Danielle Terrigino that Kotler would temporarily serve as acting Charge Scenic Artist while Nirenberg was unavailable. During Season 27, Kotler served in that capacity on multiple days across several weeks, including during a period in early September 2025, and NBCUniversal's payroll records reflect that he was compensated in the Charge Scenic Artist classification for those assignments.

**45.** While serving as acting Charge Scenic Artist, Kotler was responsible for the department's day-to-day staffing, scheduling, and approval functions. During at least one such assignment, Human Resources required Kotler to continue offering available work to Carolan pursuant to its predetermined engagement directive, rather than permitting him to exercise the approval function contemplated by Article I(C)(6). Terrigino raised no objection to Kotler's temporary service as Charge Scenic Artist, and NBCUniversal accepted and relied upon his performance in that capacity.

**46.** On August 27, 2025, Propmaster Don O'Reilly requested that the scenic department engage a specialist with particular skills required for a specific assignment. Nirenberg

submitted the request to HR and explained why the specialist was needed before Carolan was offered the work. HR denied the request and directed that Carolan be prioritized, notwithstanding the specialized nature of the assignment and Nirenberg's assessment of the department's operational needs.

**47.** When Nirenberg attended production meetings or was otherwise unavailable, Kotler performed staffing outreach and related day-to-day functions with NBCUniversal's knowledge and acceptance. On August 26, September 5, and September 15, 2025, Kotler contacted Carolan concerning available work while also contacting other members of the crew. The other employees responded to the outreach, but Carolan did not. Kotler documented those attempts and provided the communications to NBCUniversal when HR later questioned whether Carolan had been contacted.

**G. HR Reverses Its Staffing Direction**

**47.** On August 28, 2025, HR confirmed receipt of screenshots documenting Plaintiffs' attempts to contact Carolan concerning available work. On September 10, 2025, HR again asked Kotler to verify the communications, and Kotler supplied additional screenshots showing the dates, times, and content of the outreach. Those records demonstrated that Plaintiffs had repeatedly contacted Carolan using the telephone number and communication methods previously used for work assignments.

**48.** On September 19, 2025, after reviewing the documented pattern of unanswered outreach, HR drafted a message for Nirenberg to send to Carolan informing her that Plaintiffs would no longer contact her concerning work because of her repeated failure to respond.

Nirenberg sent the HR-drafted message at approximately 6:08 p.m., in accordance with HR's direction.

**49.** On September 22, 2025, Carolan responded by claiming that she had not received the prior communications and demanding proof of Plaintiffs' outreach. Later that day, HR reversed its September 19 direction and required Plaintiffs to resume contacting Carolan for available work, notwithstanding the screenshots and communication records Plaintiffs had already supplied documenting their repeated attempts to reach her.

**50.** On October 30, 2025, HR again instructed Kotler to contact Carolan concerning available work. HR stated that, if Carolan failed to respond, it would assume that she no longer wished to be considered for work going forward. This instruction was consistent with HR's earlier recognition that Plaintiffs had repeatedly attempted to contact Carolan without receiving timely responses.

**51.** During October 2025, Kotler provided Danielle Terrigino with a chronology documenting the staffing incidents, communications, and workplace conduct involving Carolan that had led to his continuing concerns. The chronology was based upon Kotler's own experiences, records, and communications and identified conduct that he believed was inconsistent with NBCUniversal's workplace-respect policies and training. Kotler did not purport to conduct an independent workplace investigation. Terrigino nevertheless cautioned him that "doing your own investigation could be perceived as bad optics." Terrigino did not identify any material inaccuracy in the chronology or explain why Kotler's preservation and presentation of his own records was improper.

**52.** Kotler understood that statement as pressure to curtail his documentation and reporting of workplace concerns and as a warning that preserving evidence concerning Carolan's conduct could itself be viewed negatively by Human Resources. The statement reasonably tended to chill or discourage further documentation and reporting, although Kotler continued attempting to raise his concerns through the Employer's internal processes.

**53.** On November 12, 2025, Kotler offered Carolan last-minute work for the following day. Carolan initially declined the assignment. She thereafter accused Kotler of failing to contact her before contacting another crew member, despite Kotler's records, which he provided to HR, reflecting that he had first offered the assignment to Carolan and contacted a replacement only after she declined.

**54.** On November 13, 2025, Kotler submitted another written complaint to HR documenting the continuing staffing problems involving Carolan. He explained that, on at least five consecutive occasions, Carolan had failed to respond, called out sick, or declined available work. Kotler further reported that, when confronted with records confirming that Plaintiffs had contacted her, Carolan responded with accusations that the records were false or manipulated and adopted an increasingly hostile and confrontational tone.

**55.** Later that day, Kotler participated in a call with HR representative Danielle Terrigino while Local 829 representative Teresa Gozzo listened. Kotler stated that he wanted to file a formal complaint concerning the continuing harassment and disparagement he experienced both at and outside the workplace. He reminded Terrigino that Carolan had previously accused him and his brother of being "predators," made additional unfounded allegations concerning his interactions with another employee's daughter, and continued repeating

those accusations privately and publicly even though NBCUniversal's investigation had concluded that Kotler had not violated Company policy.

**56.** Kotler explained that Carolan's continuing accusations made him feel unsafe and uncomfortable being alone with her on set and caused him to fear that she would make additional baseless allegations. He further objected that, despite his repeated complaints and the results of NBCUniversal's prior investigation, the Employer continued requiring Plaintiffs to prioritize Carolan for available work over other crew members.

**57.** Terrigino acknowledged that Kotler's communications with Carolan had been professional, stating: "I definitely understand and I definitely appreciate the, like, your response back to her, it was nothing but professional. So I do want to just acknowledge that and let you know that I do appreciate that as well." HR nevertheless did not identify any resolution of Kotler's complaint, disclose any corrective action concerning Carolan's conduct, or modify its directive requiring Plaintiffs to prioritize her for available work.

**58.** On November 14, 2025, after Carolan complained to HR that she was not receiving timely offers of work, HR required Kotler to produce screenshots supporting his staffing decisions. Kotler complied and supplied records showing that he had contacted Carolan before contacting Gennady Feldman, the employee who ultimately accepted the assignment. The records reflected that Kotler contacted Feldman only after Carolan had declined the work, and that Feldman promptly accepted without incident.

**H. The Employer Directs Plaintiffs to Disregard Article I(C)(6)**

**57.** On November 19, 2025, UPM Krysten Yoniak and Executive Producer Ken Brown summoned Nirenberg to a closed-door meeting concerning the continued engagement of

Carolan. During that meeting, they instructed him that he was required to engage Carolan regardless of whether the scenic department had sufficient budgeted man-days or an operational need for additional staffing. They further stated that management would “come in and keep an eye on her, whatever it took,” making clear that Carolan’s engagement had been predetermined by management.

**58.** Nirenberg objected to the directive and explained that requiring him to engage Carolan irrespective of budget, staffing needs, performance concerns, or his own assessment eliminated the approval function assigned to the Charge Scenic Artist under Article I(C)(6). The producers responded that Carolan’s engagement was required by Human Resources and represented that they lacked authority to alter that decision. Nirenberg left the November 19 meeting understanding that he was required to engage Carolan and that refusal was not a realistic option. He thereafter complied because he felt intimidated and compelled by management’s directive, not because he had independently or voluntarily approved Carolan pursuant to Article I(C)(6).

**59.** On November 20, 2025, Kotler participated in a teleconference with HR Director Sofia Vazquez, Union Representative Teresa Gozzo, and his private counsel concerning the same staffing dispute. During the call, Kotler objected to the Employer’s continuing directive that Plaintiffs prioritize and engage Carolan, expressly invoked Article I(C)(6), and explained that the directive deprived the Charge Scenic Artist of the approval contemplated by the CBA. Kotler further advised that he would seek a contractual grievance if the Employer continued to disregard or override that requirement.

**60.** During the November 20 teleconference, Vazquez confirmed that HR's investigation concerning Carolan had concluded and stated that appropriate action had been taken. She nevertheless declined to identify the action, provide written confirmation, or explain how HR had addressed the documented concerns raised by Plaintiffs and other crew members. Despite acknowledging that the investigation was complete, the Employer continued directing Plaintiffs to prioritize Carolan for available work and treated her engagement as mandatory rather than subject to the approval required by Article I(C)(6).

### I. Local 829's Pre-Grievance Intervention

**61.** Following the November 20 meeting, Local 829 National Business Agent Carl Mulert telephoned Kotler on November 24, 2025. Rather than address the substance of Kotler's contractual objection, Mulert challenged the presence of Kotler's private counsel during that meeting and questioned why counsel had participated. Kotler explained that he lacked confidence that his assigned Union representative would adequately protect his interests. Mulert stated that he had not previously been familiar with the matter and that he would refer it to Labor Relations.

**62.** Less than three weeks later, on December 10, 2025, Mulert emailed Plaintiffs proposing a joint meeting with Human Resources to "clarify expectations" and "align on a path forward." He also represented that he had spoken with HR and that matters were "running smoothly." Plaintiffs disputed that characterization because the Employer had not withdrawn or modified its directive, Carolan's engagement continued to be treated as mandatory, and the underlying contractual dispute remained unresolved.

**63.** Viewed in the context of the Employer's prior directives and the unresolved contractual dispute, Plaintiffs understood Mulert's proposed meeting and characterization that matters were "running smoothly" as further pressure to accept Carolan's mandatory engagement rather than obtain meaningful Union assistance.

**64.** Six days later, on December 16, 2025, Plaintiffs participated in a recorded teleconference with Mulert concerning the continuing hiring dispute. During that call, Mulert stated that the Employer decided who would be engaged "regardless of the CBA" and instructed Plaintiffs that they were required to "listen to the company." Mulert did not identify any contractual language supporting that position or explain how it could be reconciled with the approval requirement set forth in Article I(C)(6).

**65.** Following that teleconference, Mulert sent a text message later that same day representing that Nirenberg had authorized him to inform Human Resources that Carolan was "on the list" for engagement. Nirenberg had not given Mulert that authorization and had not withdrawn his objection to the Employer's directive. To the contrary, Nirenberg continued to maintain that any engagement of Carolan imposed by management did not reflect his voluntary approval under Article I(C)(6).

**66.** The following day, December 17, 2025, Yoniak attempted to arrange an in-person meeting involving Local 829, Human Resources, Brown, and other production personnel concerning Plaintiffs' continued refusal to treat Carolan's engagement as predetermined. Yoniak represented that Mulert would attend the meeting as Plaintiffs' Union representative and, on that basis, indicated that private counsel was unnecessary or would not be permitted to attend.

**67.** Plaintiffs requested that their private counsel be permitted to attend because the meeting concerned potential discipline and the interpretation of their contractual rights. By that time, however, Plaintiffs had lost confidence that Mulert would advocate independently on their behalf because he had instructed them to follow the Employer "regardless of the CBA" and had falsely represented that Nirenberg authorized him to tell HR that Carolan was "on the list." Mulert did not challenge the Employer's exclusion of counsel, secure alternative Union representation, or otherwise ensure that Plaintiffs' contractual objections would be meaningfully presented.

### J. The December 18 Written Directives and Warnings

**68.** On December 18, 2025, Terrigino emailed separate written directives and warnings to Kotler and Nirenberg concerning the continued engagement of Carolan. The communications memorialized the Employer's position that Plaintiffs were required to prioritize Carolan for available work and treated compliance with that directive as an employment expectation.

**69.** The directive issued to Kotler required him to offer available work to Carolan before offering the work to other Journeyperson Scenic Artists, including crew members with greater seniority, experience, or an established history of reliable availability. The directive issued to Nirenberg stated that he had agreed to this condition when he accepted the Charge Scenic Artist position, notwithstanding his repeated objections and his position that any prior compliance had resulted from the Employer's non-negotiable ultimatum rather than his voluntary approval under Article I(C)(6).

**70.** The December 18 directives further required Plaintiffs to offer Carolan the same number of workdays offered to other crew members, provide her with the same period of time to respond, use a standardized text message when contacting her, and notify Human Resources or Brown if she failed to respond. These requirements imposed a special, HR-supervised protocol governing Carolan's engagement that did not apply in the same manner to ordinary staffing decisions within the scenic department.

**71.** The December 18 directives formalized and enforced the Employer's predetermined selection of Carolan by removing Plaintiffs' ability to evaluate her engagement through the ordinary staffing process and by treating the approval required under Article I(C)(6) as already satisfied. The warnings further placed Plaintiffs on notice that continued failure to comply with the Employer's directive could result in additional corrective or disciplinary action, thereby penalizing them for continuing to invoke the contractual approval requirement.

**K. Plaintiffs Demand Contractual Grievances and the Union Refuses Kotler's Claim**

**72.** By written demand dated December 23, 2025, Plaintiffs, through counsel, requested that Local 829 initiate grievances challenging the Employer's interference with Article I(C)(6) and the December 18 directives and discipline.

**73.** In that demand, Plaintiffs explained that Nirenberg had never independently or voluntarily approved Carolan pursuant to Article I(C)(6). The Employer had conditioned his appointment on an advance agreement to engage her, compelled his compliance with that condition, and later renewed and enforced the directive on November 19 and December 18.

**74.** As to Kotler, Plaintiffs further explained that the Employer had assigned and compensated him as acting Charge Scenic Artist during Nirenberg's absences and had required him, while serving in that capacity, to administer the same predetermined engagement directive concerning Carolan. Plaintiffs asserted that Kotler possessed a direct contractual claim under Article I(C)(6) for the periods during which he served as acting Charge Scenic Artist, as well as a separate claim under Article 17(C) arising from the discipline imposed upon him for objecting to the Employer's override of the contractual approval requirement and seeking Union assistance.

**75.** Six days later, on December 29, 2025, Union counsel declined to file a grievance for Kotler based on the Union's then-stated position that only Nirenberg possessed the relevant contractual claim. The Union also suggested, without identifying its factual or contractual basis, that Nirenberg's Charge Scenic Artist position might render him managerial, while simultaneously stating that it would file a grievance on his behalf.

**76.** The Union's suggestion was inconsistent with Local 829's own treatment of Nirenberg. After he became Charge Scenic Artist, the Union continued to recognize him as a member of the bargaining unit, collect weekly dues from him, and maintain his participation in pension and healthcare plans associated with Local 829. Neither the Union nor the Employer had previously advised Nirenberg that becoming Charge Scenic Artist removed him from the bargaining unit or altered his eligibility for representation under the CBA.

**77.** In response, on January 5, 2026, Plaintiffs' counsel disputed those conclusions, explained that both Plaintiffs remained bargaining-unit members represented by Local 829, and

identified Kotler's separate claim arising from his own written warning and the Employer's acceptance of his temporary staffing responsibilities.

**78.** Four days later, Union counsel responded that Plaintiffs were not similarly situated and did not possess substantively identical claims.

**79.** Seeking a definitive answer, Plaintiffs' counsel, on January 15, 2026, requested a determination concerning whether the Union would grieve Kotler's discipline and asked the Union to clarify whether it continued to maintain that Nirenberg was managerial.

**80.** On January 21, 2026, after considering Plaintiffs' intervening submissions, the Union abandoned its prior suggestion that Nirenberg's Charge Scenic Artist position might render him managerial, without explaining the factual or contractual basis for having raised that position. The Union nevertheless issued a further definitive determination that no contractual provision had been violated and that it would not pursue a grievance for Kotler.

**81.** The January 21 determination followed the Union's continued substantive consideration of Kotler's grievance after December 29, addressed Plaintiffs' intervening submissions, abandoned the Union's prior managerial suggestion, relied on a different stated rationale, and definitively ended the Union's consideration of his grievance.

**82.** After December 29, the Union continued corresponding with Plaintiffs concerning the merits of Kotler's grievance and did not inform them that the matter had been finally closed or that no further consideration would be provided. Instead, it considered Plaintiffs' additional submissions and issued its definitive refusal on January 21, 2026.

**L. The Union Allows Nirenberg's Arbitration Remedy to Expire**

**83.** On January 6, 2026, Local 829 filed a grievance on Nirenberg's behalf challenging the Employer's December 18 written directive, its treatment of Carolan's approval as predetermined, and its interference with the approval function established by Article I(C)(6). The grievance placed both the Union and the Employer on notice that Nirenberg disputed that his compelled compliance constituted voluntary approval of Carolan's engagement.

**84.** On January 22, 2026, the Employer denied the grievance. The Employer asserted that Nirenberg had agreed to engage Carolan as a condition of accepting the Charge Scenic Artist position and therefore maintained that the December 18 directive merely enforced an existing agreement rather than overriding his contractual authority.

**85.** Nirenberg disputed that characterization. He maintained that the purported agreement resulted from the non-negotiable ultimatum delivered by Human Resources on July 8, 2025, when he was informed that he would not receive the Charge Scenic Artist position unless he agreed to engage Carolan. Nirenberg therefore maintained that his subsequent compliance did not constitute a voluntary or independent exercise of the approval function established by Article I(C)(6).

**86.** Local 829 knew that the Employer's account was materially disputed. Plaintiffs informed the Union of the July 8 ultimatum, the November 19 directive requiring Carolan's engagement regardless of available budgeted man-days, Kotler's November 20 invocation of Article I(C)(6), Mulert's December statements that the Employer controlled hiring

"regardless of the CBA," and the December 18 written directives treating Carolan's approval as already established.

**87.** Local 829 nevertheless closed the grievance without conducting a reasonable investigation into that disputed factual record. The Union did not interview Nirenberg concerning the July 8 meeting or the circumstances of his purported agreement; did not ask him to provide a written or formal response to the Employer's January 22 denial; did not interview Terrigino, Vazquez, Yoniak, Brown, Davis, or other witnesses with knowledge of the July and November directives; and did not meaningfully review the identified emails, text messages, written warnings, or recorded communications bearing on whether Nirenberg's approval had been voluntary or compelled.

**88.** The Union also failed to analyze the central contractual distinction raised by the grievance. Plaintiffs did not dispute that the Employer could determine whether additional staffing was necessary or whether to seek the engagement of a Journeyperson Scenic Artist. They maintained that, once the Employer selected Carolan for engagement, Article I(C)(6) separately required that she meet with the approval of the Charge Scenic Artist and did not permit the Employer to dictate that approval in advance.

**89.** Article 17(B) required any unresolved dispute concerning the December 18, 2025 directive to be submitted to arbitration within the applicable contractual period and, in no event, later than sixty days after the alleged violation. The outside deadline for submitting the December 18 dispute to arbitration was therefore February 16, 2026.

**90.** Local 829 did not submit Nirenberg's grievance to arbitration by February 16, 2026, seek an agreement extending or preserving the contractual deadline, or advise Nirenberg before

the deadline that it did not intend to pursue arbitration. Because Article 17(B) authorized only the Union or the Producer to invoke arbitration, Nirenberg had no contractual means to submit or preserve the grievance independently.

**91.** On March 13, 2026, after the contractual arbitration deadline had expired, Local 829 informed Nirenberg that it had closed the grievance. In doing so, the Union accepted the Employer's assertion that Nirenberg had agreed to the hiring condition without resolving the conflicting evidence concerning the July 8 ultimatum, the later directives, or whether his compliance represented voluntary approval under Article I(C)(6).

**M. NLRB Charges, Investigatory Meetings, and the April 30 Warnings**

**92.** On February 4, 2026, Kotler electronically submitted an unfair-labor-practice charge against Local 829, alleging that the Union had failed to represent him fairly in connection with the Employer's staffing directive, the discipline imposed upon him, and his request for a contractual grievance. Region 2 of the National Labor Relations Board docketed the charge on February 9, 2026, as Case No. 02-CB-380732.

**93.** On April 14, 2026, Nirenberg filed a separate unfair-labor-practice charge concerning Local 829's handling and abandonment of his grievance. Nirenberg alleged that the Union had failed to conduct a meaningful investigation, allowed the Article 17(B) arbitration deadline to expire, and accepted the Employer's disputed account without adequately considering the evidence identified by Plaintiffs.

**94.** Against that backdrop, during March and April 2026, the Employer sought to conduct separate investigatory meetings with Kotler and Nirenberg concerning the continuing staffing dispute, their handling of available work for Carolan, and their alleged failure to

comply with the Employer's December 18 directives. Because the conduct at issue had already resulted in written warnings, the proposed meetings exposed Plaintiffs to the possibility of further discipline.

**95.** In response to the meeting requests, Plaintiffs asked Local 829 to provide Union representation. They contacted Union representatives Adam Levi and Teresa Gozzo regarding the proposed meetings and the deadlines imposed by the Employer. Levi and Gozzo did not respond, confirm their availability, or arrange alternative representation in sufficient time for Plaintiffs to attend with a Union representative present.

**96.** Plaintiffs did not refuse to participate in the investigatory meetings or state that they would not cooperate with the Employer's inquiry. They requested that the meetings be scheduled when Union representation was available and objected to the Employer proceeding in their absence while those requests remained unresolved.

**97.** By April 30, 2026, the Employer had actual knowledge that Plaintiffs had invoked Article I(C)(6), objected to the Employer's continuing staffing directive, demanded contractual grievances through counsel, requested Union representation during investigatory meetings, and challenged Local 829's handling of their contractual claims. That knowledge arose from Human Resources' participation in the November 20 teleconference, the Employer's receipt and denial of Nirenberg's grievance, correspondence submitted by Plaintiffs and their counsel, and the Employer's direct involvement in the continuing investigatory process.

**98.** Twelve days after Season 27 wrapped on April 18, 2026, and while Plaintiffs were on customary seasonal hiatus, were not actively performing work on the production, and were

awaiting consideration for Season 28, the Employer, acting through its Human Resources and Labor Relations personnel, issued final written warnings to both Plaintiffs. The warnings cited their alleged failure to comply with the continuing directive concerning Carolan, characterized their responses to the Employer's investigatory requests as noncompliant, and warned that any further failure to follow management's directives could result in additional discipline, including termination.

**99.** The April 30 warnings did not identify any material deficiency in Plaintiffs' scenic work, craftsmanship, attendance, or technical performance. Instead, they arose from the continuing dispute concerning Plaintiffs' refusal to treat Carolan's approval and prioritization as predetermined and their efforts to invoke Article I(C)(6), obtain Union representation, and pursue contractual grievances.

**N. The Employer Excludes Plaintiffs from Season 28**

**100.** At the time the Employer issued the April 30 final written warnings, Season 27 had already wrapped on April 18, 2026. Plaintiffs were no longer actively performing work on the production and had entered the customary seasonal hiatus while awaiting consideration for engagement during Season 28. During the hiatus, crew members generally went their separate ways, with some accepting work on other productions and others taking time off.

**101.** During the customary seasonal hiatus, Production Designer Jeff Crye, whom Plaintiffs understood to be responsible for selecting the scenic leadership team, verbally informed Plaintiffs that they would return for Season 28 and discussed the upcoming season as though their re-engagement had already been decided. Crye wanted Plaintiffs to return based on their longstanding work and performance on the production.

**102.** Both Plaintiffs had substantial histories of repeated engagement on *Law & Order: SVU*. Kotler had worked on the production since 2019, became part of its core scenic crew in 2020, and had most recently served as Foreman. Nirenberg had worked on the production for approximately ten seasons, including eight seasons as Camera Scenic Artist, before serving as Charge Scenic Artist during Season 27. Neither Plaintiff's work had been identified as deficient at the conclusion of Season 27.

**103.** Based on that established course of repeated engagement, Plaintiffs reasonably expected to be considered for their former positions or substantially equivalent scenic-department positions during Season 28, subject to the production's ordinary staffing needs.

**104.** During the hiatus, Nirenberg was caring for his terminally ill father-in-law. O'Brien emailed him on May 12 and again on May 26, 2026, seeking a meeting concerning the continuing employment dispute. On May 27, Nirenberg responded, explained that he was occupied with his father-in-law's terminal condition, and expressly referenced the unfair-labor-practice charge he had filed concerning Local 829's handling of his grievance. That email gave the Employer actual knowledge of Nirenberg's pending NLRB charge no later than May 27, 2026.

**105.** Nirenberg did not decline to meet, withdraw from consideration for Season 28, or state that he was unwilling to return to the production. His May 27 response informed the Employer that his inability to participate immediately resulted from a disclosed family emergency rather than any decision to abandon future employment.

**106.** Kotler was away on his honeymoon and related personal travel from approximately April 30 through May 31, 2026. During that period, he was not monitoring work-related or

personal email. On May 26, Kate O'Brien emailed Kotler requesting that he provide "a couple of time/date options" for a meeting and stated that she wished to discuss "the studio's expectations for their department heads," thereby identifying Kotler as a department head for purposes of the proposed meeting. The email did not identify a firm response deadline, state that his eligibility for Season 28 depended on an immediate response, or warn that silence would be treated as a withdrawal from future employment consideration. Kotler did not become aware of O'Brien's May 26 correspondence until June 18, 2026, when he learned that the Employer had informed Nirenberg that he would no longer be considered for Season 28 and discovered that O'Brien had sent Kotler a substantially similar communication that same day.

**107.** NBCUniversal had historically communicated with Kotler concerning urgent employment matters through telephone calls and text messages in addition to email. Before concluding that Kotler had declined further consideration, the Employer did not attempt to contact him by telephone or text, send a follow-up email identifying a deadline, or warn him that his future employment would be affected if he did not attend the proposed meeting.

**108.** Neither Plaintiff stated that he was unwilling to return to *Law & Order: SVU*, withdrew from consideration, declined an offer of Season 28 employment, or authorized the Employer to treat him as having abandoned future employment.

**109.** On June 18, 2026, O'Brien sent substantially similar communications to Plaintiffs stating that, because they had not participated in the proposed meetings during the unpaid seasonal hiatus, the Employer deemed them to have "declined further consideration" for Season 28,

notwithstanding Nirenberg's May 27 response and Kotler's lack of actual notice of the May 26 request.

**110.** During the seasonal hiatus, Plaintiffs were not actively performing work, receiving compensation, or assigned duties for the production. The Employer did not advise them that participation in the proposed meetings was a condition of consideration for Season 28 or that failure to participate would be treated as misconduct, insubordination, or a voluntary withdrawal from future employment.

**111.** The June 18 communications treated Plaintiffs identically despite their materially different circumstances. Nirenberg had responded to O'Brien, disclosed a terminal family emergency, and explained his temporary unavailability. Kotler had been away for more than a month, had not seen O'Brien's May 26 email, had received no telephone call or text message alerting him to the meeting request, and had not been given any firm deadline or warning that failure to respond would be treated as a relinquishment of Season 28 employment.

**112.** The June 18 communications constituted an affirmative decision by the Employer not to consider or engage Plaintiffs for Season 28. Plaintiffs had not voluntarily declined consideration, and the Employer did not identify any performance-based or operational reason for excluding them.

**113.** Upon information and belief, Season 28 proceeded with an operating scenic department, and the work and functions previously performed by Plaintiffs were assigned to or performed by other personnel. Plaintiffs were not contacted, interviewed, or otherwise considered for their former or substantially equivalent positions.

**114.** At the time of the June 18 decision, the Employer knew that Kotler had served and been compensated as acting Charge Scenic Artist during Nirenberg's absences, had been required while serving in that capacity to administer the predetermined engagement directive concerning Carolan, had expressly invoked Article I(C)(6), had objected to the Employer's override of the contractual approval requirement, had requested Union representation, had demanded a contractual grievance through counsel, and had challenged Local 829's handling of his claim.

**115.** The Employer also knew that Nirenberg had consistently objected that his engagement of Carolan was compelled by management and did not constitute voluntary approval under Article I(C)(6), pursued a contractual grievance, requested Union representation, challenged Local 829's abandonment of that grievance, and expressly referenced his NLRB charge in his May 27 email to O'Brien.

**116.** The requested meetings concerned the same continuing staffing dispute that had produced the December 18, 2025 directives and the April 30, 2026 final written warnings. The Employer's June 18 decision therefore followed a continuing sequence of escalating actions arising from Plaintiffs' efforts to invoke the CBA and obtain Union representation.

**117.** The Employer's stated reason for excluding Plaintiffs was pretextual because Plaintiffs had never declined consideration; Nirenberg had expressly responded and explained his emergency; Kotler had not been given a firm deadline or warning; the Employer did not use its customary methods of urgent communication; and the Employer treated Plaintiffs' nonparticipation in investigatory meetings during an unpaid seasonal hiatus, while they

were on personal time and not performing work for the production, as a voluntary relinquishment of future employment.

**118.** Plaintiffs allege that the Employer denied them consideration as employees and/or applicants because they invoked Article I(C)(6), requested Union representation, demanded contractual grievances, challenged the Union's handling of those grievances, and engaged in related Union activities, in violation of Article 17(C).

**O. Local 829 Refuses to Grieve the Season 28 Decision**

**119.** After receiving the June 18 communications, Plaintiffs, through counsel, requested that Local 829 file grievances challenging the Employer's refusal to consider or engage them for Season 28.

**120.** Plaintiffs did not contend that the CBA guaranteed automatic employment during every subsequent season or deprived the Employer of its ordinary authority to determine whether positions were available. They asserted that Article 17(C) prohibited the Employer from denying them consideration or employment because of their Union activities.

**121.** Plaintiffs identified those Union activities as including their invocation of Article I(C)(6), requests for Union representation, demands for contractual grievances, opposition to Local 829's handling of those grievances, and filing of unfair-labor-practice charges.

**122.** Plaintiffs further informed the Union that the Employer's June 18 rationale was disputed because neither Plaintiff had declined future employment; Nirenberg had responded and disclosed a family emergency; Kotler had not been given a response deadline or warning; and both Plaintiffs had historically been repeatedly engaged on the production.

**123.** On June 30, 2026, Local 829 unequivocally refused to pursue the requested grievances. The Union relied upon at-will language contained in Plaintiffs' Deal Memos and stated that the CBA did not guarantee continued employment. The Union did not address Plaintiffs' assertion that Production Designer Jeff Crye had already verbally informed them that they would return for Season 28 or that Human Resources thereafter overrode or prevented that anticipated re-engagement.

**124.** The Union's response did not address Plaintiffs' actual contractual theory. Plaintiffs did not claim a general right to continued employment. They claimed that Article 17(C) prohibited the Employer from denying consideration or employment because of Union activities and expressly extended that protection to both employees and applicants.

**125.** Before refusing the grievances, Local 829 did not investigate whether Plaintiffs' Season 28 positions or substantially equivalent positions remained available; whether other personnel had been engaged to perform their functions; who participated in the June 18 decision; when the decision was made; or whether the stated rationale was consistent with the Employer's prior communication and re-engagement practices.

**126.** The Union also did not investigate the Employer's knowledge of Plaintiffs' Union activities, the temporal relationship between those activities and the June 18 decision, Nirenberg's May 27 response, or the absence of any firm deadline or warning in O'Brien's May 26 communication to Kotler.

## COUNT I:

**BREACH OF COLLECTIVE BARGAINING AGREEMENT UNDER SECTION 301(a) OF THE LABOR MANAGEMENT RELATIONS ACT**
**(*Against NBCUniversal Media, LLC, Universal Television LLC, and Universal City Studios LLC)***

**127.** Plaintiffs repeat and reallege each preceding allegation as if fully set forth herein.

**128.** Universal City Studios LLC was a Producer bound by the CBA. NBCUniversal Media, LLC and Universal Television LLC participated in and administered the challenged employment and labor-relations decisions and are liable to the extent the evidence establishes that they assumed or administered the relevant CBA obligations, acted as agents or alter egos of Universal City Studios LLC, or operated with it as a single integrated employer for purposes of the conduct alleged.

**129.** Article I(C)(6) required that a Journeyperson Scenic Artist selected for engagement meet with the approval of the Charge Scenic Artist.

**130.** The Employer retained authority to determine whether additional staffing was needed and whether to seek the engagement of a Journeyperson Scenic Artist. It could not, however, eliminate the distinct approval function assigned to the Charge Scenic Artist, dictate the result of that approval in advance, or discipline bargaining-unit employees for invoking or seeking enforcement of the contractual requirement.

**131.** As the regularly assigned Charge Scenic Artist, Nirenberg was the bargaining-unit employee to whom Article I(C)(6) directly assigned the approval function. The Employer breached that provision as to Nirenberg by conditioning his appointment on his advance agreement to engage Carolan, compelling his compliance, repeatedly treating her approval

as predetermined, and disciplining him for maintaining that compelled compliance did not constitute voluntary approval.

**132.** Nirenberg's compliance with the Employer's directives did not waive Article I(C)(6) or transform the Employer's predetermined selection into an independent and voluntary exercise of his contractual approval function.

**133.** In his regular classification as Foreman, Kotler does not allege that Article I(C)(6) independently assigned him the approval authority reserved to the Charge Scenic Artist. His direct rights under Article I(C)(6) arise from the discrete periods during which the Employer assigned and compensated him as acting Charge Scenic Artist.

**134.** During the periods in which the Employer assigned and compensated Kotler as acting Charge Scenic Artist, Article I(C)(6) directly applied to his performance of that temporary classification. The Employer breached that provision as to Kotler by requiring him, while serving as acting Charge Scenic Artist, to administer its predetermined engagement directive concerning Carolan rather than permitting him to exercise the approval function assigned to that position.

**135.** Separate from his direct Article I(C)(6) claim arising from those temporary assignments, Kotler was protected by Article 17(C) when he supported Nirenberg's invocation of Article I(C)(6), objected to the Employer's continuing override of that provision, requested Union representation, and demanded a grievance concerning the discipline imposed upon him.

**136.** Article 17(C) independently prohibited the Employer from discriminating against an employee or applicant because of Union membership or Union activities.

**137.** Nirenberg engaged in Union activities by invoking his approval rights under Article I(C)(6), objecting to the Employer's predetermined selection of Carolan, requesting Union representation, pursuing a contractual grievance, challenging the Union's abandonment of that grievance, and filing an unfair-labor-practice charge concerning the Union's representation.

**138.** Kotler engaged in Union activities by invoking Article I(C)(6) while serving as acting Charge Scenic Artist, supporting and seeking enforcement of the contractual approval requirement, objecting to the Employer's staffing directive, requesting Union representation, demanding a grievance concerning the discipline imposed upon him, challenging the Union's refusal to pursue that grievance, and filing an unfair-labor-practice charge.

**139.** The Employer knew of those activities through Plaintiffs' direct communications with Human Resources and production management, the participation of Union representatives in meetings concerning the contractual dispute, counsel's grievance demands, the Employer's receipt and denial of Nirenberg's grievance, and Nirenberg's May 27 reference to his NLRB charge.

**140.** The Employer breached Article 17(C) as to Nirenberg by escalating discipline and refusing to consider or engage him for Season 28 after he invoked Article I(C)(6), sought Union representation, pursued a grievance, and challenged the Union's handling of his contractual claim.

**141.** The Employer separately breached Article 17(C) as to Kotler by disciplining him and refusing to consider or engage him for Season 28 after he invoked and supported

enforcement of the contractual approval requirement, sought Union representation, demanded a grievance concerning his own discipline, and challenged the Union's handling of his claim.

**142.** Article 17(C) applies to employees and applicants. At the time of the Season 28 decision, Plaintiffs were employees awaiting re-engagement and/or applicants seeking their former or substantially equivalent positions.

**143.** Plaintiffs do not allege that the CBA guaranteed employment in every subsequent season. They allege that the CBA prohibited the Employer from denying consideration or employment because of Union activities.

**144.** Plaintiffs timely sought the Union's assistance and requested grievances concerning the December 18 directives and warnings, the April 30 discipline, and the June 18 Season 28 decision.

**145.** Article 17(B) authorized only the Union or the Producer to submit an unresolved contractual dispute to arbitration. Plaintiffs therefore could not independently invoke arbitration or preserve their contractual remedies without the Union's participation.

**146.** The Union's refusal to pursue Kotler's grievance, its failure to submit Nirenberg's grievance to arbitration within the contractual period, and its June 30 refusal to pursue Plaintiffs' Season 28 grievances prevented Plaintiffs from exhausting the contractual process and rendered further resort to that process futile.

**147.** Plaintiffs are therefore excused from further contractual exhaustion.

**148.** The Employer's breaches directly and proximately caused Plaintiffs to sustain lost wages, lost employment benefits, lost pension, health and annuity contributions, and other foreseeable economic losses.

**149.** By the foregoing conduct, the Employer Defendants breached the CBA in violation of Section 301(a) of the LMRA, 29 U.S.C. § 185(a).

**COUNT II:**

**BREACH OF DUTY OF FAIR REPRESENTATION IN CONNECTION WITH PLAINTIFFS' HYBRID SECTION 301(a) CLAIM**
**(*Against IATSE Local 829*)**

**150.** Plaintiffs repeat and reallege each preceding allegation as if fully set forth herein.

**151.** Local 829 was Plaintiffs' exclusive collective-bargaining representative within the meaning of Section 9(a) of the NLRA, 29 U.S.C. § 159(a). Under Article 17(B) of the CBA, Local 829 also exercised exclusive control, as between the Union and individual bargaining-unit employees, over whether Plaintiffs' unresolved contractual disputes would be submitted to arbitration.

**152.** By virtue of its status as Plaintiffs' exclusive bargaining representative, Local 829 owed Plaintiffs a duty to represent them fairly and without conduct that was arbitrary, discriminatory, or in bad faith. A union acts arbitrarily when, in light of the factual and legal circumstances confronting it, its conduct falls so far outside the wide range of reasonableness afforded to bargaining representatives as to be irrational. *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991); *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).

**153.** Local 829 acted arbitrarily in evaluating Kotler's grievance. Before issuing its January 21 determination, the Union did not interview him, investigate the periods during which he had served as acting Charge Scenic Artist, request or review payroll records reflecting that he had been compensated in that classification, investigate the Employer's directives to him during those assignments, examine the circumstances of his written warning, or analyze his contractual protections under Articles I(C)(6) and 17(C).

**154.** Kotler's contractual claim was not merely derivative of Nirenberg's grievance. It concerned the Employer's direct interference with the Article I(C)(6) approval function during periods when Kotler served as acting Charge Scenic Artist, the discipline imposed directly upon him, and the protections afforded to him under Article 17(C). The Union could not rationally reject his grievance solely because his regular classification differed from Nirenberg's without investigating the temporary Charge Scenic Artist assignments that formed part of Kotler's claim.

**155.** Local 829 acted arbitrarily in handling Nirenberg's grievance. The Union knew that the Employer's assertion that Nirenberg voluntarily agreed to engage Carolan was disputed and had been offered evidence concerning the coercive circumstances surrounding that purported agreement.

**156.** Before closing Nirenberg's grievance, the Union did not interview him, obtain his formal response to the Employer's account, review the identified recordings and communications, interview witnesses to the July or November directives, or distinguish voluntary contractual approval from compliance obtained through a non-negotiable management ultimatum.

**157.** The Union allowed the February 16, 2026 outside arbitration deadline to expire and then closed Nirenberg's grievance on March 13, after he could no longer preserve the claim independently.

**158.** Local 829 also acted in bad faith through National Business Agent Carl Mulert.

**159.** On December 16, 2025, Mulert represented that Nirenberg had authorized him to tell Human Resources that Carolan was "on the list" for engagement. Nirenberg had not given that authorization.

**160.** During a recorded teleconference that day, Mulert stated that the Employer possessed authority to determine who would be engaged "regardless of the CBA" and that Plaintiffs were required to follow the Employer's directive.

**161.** Mulert's misrepresentation of authorization, together with his stated willingness to disregard Article I(C)(6), supports a reasonable inference that the Union was attempting to secure Plaintiffs' compliance with the Employer's directive rather than impartially enforce the CBA on their behalf.

**162.** Local 829 separately acted arbitrarily when it refused to pursue Plaintiffs' Season 28 grievances.

**163.** The Union treated the absence of guaranteed continued employment as dispositive while failing to analyze Plaintiffs' separate claim that Article 17(C) prohibited the Employer from denying consideration or employment because of Union activities.

**164.** The Union did not investigate the Employer's knowledge of Plaintiffs' Union activities, the temporal relationship between those activities and the Season 28 decision, the identity of the decisionmakers, the availability of Plaintiffs' positions, or the engagement of replacement employees.

**165.** Article 17(B) authorized only the Union or the Producer to submit Plaintiffs' disputes to arbitration. Plaintiffs could not preserve or pursue those remedies independently.

**166.** But for the Union's breach, Kotler's distinct grievance could have been investigated and submitted to arbitration, Nirenberg's grievance could have been evaluated on a complete record and timely advanced to arbitration, and Plaintiffs' Season 28 grievances could have been pursued under Article 17(C).

**167.** The Union's conduct directly and proximately caused Plaintiffs to lose their contractual remedies and permitted the Employer's discipline and refusal to consider them for Season 28 to remain uncorrected.

**168.** By the foregoing conduct, Local 829 breached the duty of fair representation arising from its status as Plaintiffs' exclusive bargaining representative under Section 9(a) of the NLRA, 29 U.S.C. § 159(a), in connection with Plaintiffs' hybrid claim under Section 301(a) of the LMRA, 29 U.S.C. § 185(a).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court:

**A.** Declaring that the Employer Defendants breached the collective bargaining agreement;

**B.** Declaring that Local 829 breached its duty of fair representation;

**C.** Awarding Plaintiffs back pay, front pay where appropriate, lost wages, lost employment benefits, lost pension, health and annuity contributions, and all other economic losses caused by Defendants' respective conduct;

**D.** Ordering Plaintiffs reinstated or restored to consideration for their former or substantially equivalent positions on *Law & Order: SVU* or another substantially equivalent production, to the extent such equitable relief is available and appropriate;

**E.** Directing the Employer Defendants to remove and expunge the December 18, 2025, and April 30, 2026, warnings and related disciplinary records from Plaintiffs' employment files;

**F.** Apportioning damages between the Employer Defendants and Local 829 according to the losses caused by each Defendant's respective conduct;

**G.** Awarding Plaintiffs their costs and disbursements and reasonable attorneys' fees to the extent permitted by law;

**H.** Awarding prejudgment and post-judgment interest; and

**I.** Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: New York, New York
July 21, 2026

Respectfully submitted,

**Sean A. Farrow, Esq.**
The Farrow Firm, PLLC
136 Madison Ave., 6th Fl

New York, NY 10016
Tel: (609)-304-1147
E: Sean@TheFarrowFirm.com

______________________________
**David E. Ourlicht, Esq.**
Law Offices of David E. Ourlicht, PLLC
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (917) 572-8599
E: David@ourlichtlaw.com

*Counsel for Plaintiffs Daniel Kotler and Michael Nirenberg*